JUDGE KAPLAN

# 23 CV 10172

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HEAD SPORT GMBH,<br><br>                    Plaintiff,<br><br>        v.<br><br>UP TOWN SPORT INC. and<br>JENNY SPRIZZO,<br><br>                    Defendants. | Case No. 23-cv-____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Head Sport GmbH ("Head") by its undersigned attorneys, as and for its Complaint against Defendants Up Town Sport Inc. and Jenny Sprizzo (individually and collectively "Defendants"), hereby alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

### NATURE OF THE CASE

1.    This is an action under the Trademark Laws of the United States, Title 15 U.S.C. §§ 1051, *et seq.*, for trademark counterfeiting, trademark infringement, trademark dilution, and unfair competition pursuant to the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) and (c) respectively.  In addition, this is an action for trademark counterfeiting and infringement, dilution, unfair competition, and breach of contract in violation of the statutes of the state of New York and the common law.

2.    Founded by Howard Head in Baltimore, Maryland, and with a rich history dating back to the debut of the metal ski in the late 1940's, Head today is one of the world's most well-known and popular providers of sports equipment (skis, snowboards, tennis rackets, and others), apparel, footwear, accessories (hats, gloves, and others), and other products.

3.      Head has achieved significant commercial success with extensive sales and advertising under its HEAD trade name and trademarks, and ⌒ Head Ski Tip logo (collectively the "HEAD Marks") throughout the United States.

4.      Over the decades, Head has advertised and promoted its HEAD trademark, Ski Tip Logo, and products in the United States through some of the world's most high-profile athletes, such as Andre Agassi, Arthur Ashe, Novak Djokovic, Cori "Coco" Gauff, John McEnroe, Andy Murray, Maria Sharapova, Lindsey Vonn, and many others, as depicted below.







5.  Head brings this action against Defendant Up Town Sport Inc. for breaching several provisions of its license agreement with Head both during the license term and after its termination as detailed below.  Head brings this action against Up Town Sport Inc. and Jenny Sprizzo for selling and/or offering for sale counterfeit HEAD golf wear and/or conducting business unlawfully under the HEAD name and mark without Head's knowledge or permission.

6.  Defendants acted willfully and with the understanding that those actions would harm Head.

## THE PARTIES

7.  Head Sport GmbH is a corporation of Austria with its principal place of business at Wuhrkopfweg 1, Kennelbach, Austria A-6921.

8.  Defendant Up Town Sport Inc. ("Up Town Sport") is a New York corporation with places of business at 224 W. 35th St., Ste. 306, New York, NY 10001; 1385 Broadway, Ste. 1012, New York, NY 10018; and 237 W. 37th St., Ste. 904, New York, NY 10018.

9.  Defendant Jenny Sprizzo aka Jin Gu Sprizzo, Jin Gru Sprizzo, and Jin G Sprizzo, is a resident of New York state and the principal of Up Town Sport, with business addresses at

224 W. 35th St., Ste. 306, New York, NY 10001; 1385 Broadway, Ste. 1012, New York, NY 10018; and 237 W. 37th St., Ste. 904, New York, NY 10018.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction under 28 U.S.C. § 1338, as this action arises under the federal Trademark Act, 15 U.S.C. §§ 1051, *et seq.*  This Court has jurisdiction under 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction over the state law claims as substantial and so related to the claims arising under federal law that they form part of the same case and controversy under Article III of the United States Constitution.

11.     This Court also has jurisdiction under 28 U.S.C. § 1332, because the parties are citizens of different countries and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

**12.**     This Court may exercise personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because Head is being harmed in this District; Defendants are located in and are doing business in this District; Defendants are using counterfeits and infringements of HEAD Marks on products imported into this District, stored in this District, and/or sold from this District; and the unlawful acts alleged herein arose within this judicial district.

**BACKGROUND FACTS**

A. **HEAD AND ITS HISTORY**

13.     Head's roots trace back to the late 1940's, when founder Howard Head reconceived ski construction and founded a company that, within five years, became the leading brand of skis sold in the U.S. and Europe.  In the 1960's, Head expanded into tennis, again revolutionizing a sport, with new racquet design and construction.  Since that time, Head has

4

continued to pursue its vision to bring high-performance gear to athletes of all skill levels in numerous sports.

14.     Among its range of product, Head has long offered apparel for both performance and leisure.  Beginning at least as early as 1967, Head has offered skiwear, sportswear, and footwear under its famous HEAD brand.  Today, through its own manufacturing and authorized licensees, Head offers a full range of apparel.  A sampling of Head's current apparel products and accessories is depicted below:













 

15.     From its humble roots to the present, Head has grown in popularity and enjoyed tremendous commercial success, having sold at least hundreds of millions of dollars' worth of products across its product lines throughout the United States.

16.     To build on and celebrate its success, Head has invested in advertising and promotion for its products in the United States under the HEAD Marks.  Among its successful marketing efforts, Head has promoted the HEAD Marks and products offered under them through high-profile endorsements from some of the world's most recognized professional athletes, including Andre Agassi, Ryan Cochran-Siegle, Novak Djokovic, Cori "Coco" Gauff, John McEnroe, Andy Murray, Mari Sharapova, Sloane Stephens, and Lindsey Vonn.

**B.  THE HEAD MARKS**

17.     Head has long used and licensed its HEAD Marks, including the word HEAD and

the  Ski Tip Logo to identify a wide range of clothing, equipment, and accessories.

18.     Head owns many valid and subsisting trademark registrations for the HEAD

Marks on the Principal Register of the United States Patent and Trademark Office ("USPTO"),

including:

| Mark | Reg. No. Issue Date | Goods |
|------|---------------------|-------|
| HEAD | 5254329<br><br>08-01-2017 | Compression garments, in Class 10<br><br>Sports clothing, namely, foundation garments worn to create a slimming effect; waist cinchers, in Class 25<br><br>Flooring and gymnasium exercise mats, in Class 27<br><br>Gymnastic apparatus and exercise equipment, namely, jump ropes, skipping ropes, ski ropes, exercise balls, exercise hand grippers, body-training apparatus for strengthening forearms and abdominal muscles, push-up and pull-up training bars, abdominal boards, exercise weights, balance boards for improving strength, toning, conditioning, balance, and proprioception, aerobic steps, waist trimmer exercise belts, yoga cushions, blocks, straps, mats; sporting goods and equipment for speed training, namely, speed ladders, resistance chutes, and resistance weight bags, in Class 28 |
| HEAD | 4602638<br><br>09-09-2014 | Ski goggles; snorkels; divers' masks; gloves for divers; diving goggles; diving suits, in Class 9<br><br>Sport, basic, and fashion underwear for men, ladies, and children; swimwear, in Class 25<br><br>Swimming flippers and scuba flippers, in Class 28 |
| *HEAD* | 0675190<br><br>03-10-1959 | Snow skis, in Class 28 |

| Mark | Reg. No. Issue Date | Goods |
|---|---|---|
| HEAD | 1695827<br><br>06-23-1992 | Carry-on back bags; back packs, in Class 18<br><br>Men's tennis wear, wristbands, T-shirts, and athletic shoes, in Class 25<br><br>Squash rackets, racquetball rackets, grip tape for rackets, nylon string for rackets, racket gloves, head guard tape for rackets, squash racket bags, ski gloves, and ski boots, in Class 28 |
| HEAD | 1020388<br><br>09-16-1975 | Men's and women's ski wear including pants, parkas, shirts, sweaters, suits, hats, and women's tennis wear including shorts, pants, shirts, sweaters, suits, jackets, blazers, skirts, dresses, socks, sweatbands, headbands, and tennis shoes; and women's general sportswear - namely, shorts, pants, jackets, blazers, suits, shirts, sweaters, skirts, dresses, in Class 25<br><br>Slalom skis and tennis rackets, and tennis racket covers, nylon string for tennis rackets, and ski bags, and tennis racket bags, in Class 28 |
| HEAD | 2945418<br><br>05-03-2005 | Helmets, in Class 9 |
| HEAD | 3849360<br><br>09-21-2010 | Sunglasses, ski helmets, and snowboard helmets, in Class 9<br><br>Bicycles, in Class 12<br><br>All-purpose sports bags, athletic bags, backpacks, travelling trunks, in Class 18<br><br>Gloves, caps, ski boots and snowboard boots; ski boot bags, in Class 25<br><br>Snowboards; ski and snowboard bindings; squash and racquetball rackets and bags specifically adapted therefor; racquetball gloves; grip tapes for rackets, in Class 28 |

| Mark | Reg. No. Issue Date | Goods |
|------|---------------------|-------|
|  | 3584458<br><br>03-03-2009 | Safety goggles; ski and snowboard helmets, in Class 9<br><br>All purpose sport bags, athletic bags, backpacks, briefcases, suitcases, toiletry bags sold empty, and bags with rollers, namely, traveling bags and luggage, in class 18 |
|  | 3673026<br><br>08-25-2009 | Bicycles in Class 12<br><br>Men's and women's ski wear including hats, ski boots; boots for snowboarding; and men's and women's tennis wear including shorts, pants, shirts, jackets, skirts, dresses, sweatbands, wristbands, tennis shoes; ski, casual and dress gloves for men, ladies, and children; athletic footwear; men's and women's general sportswear, namely, tracksuits, shorts, shirts, sweaters, pants, jackets, socks, headwear; ski boot bags, in International Class 25<br><br>Snow skis, snowboards; snowboard bindings; ski poles; tennis, squash, racquetball rackets; tennis racket bags; ski and snowboard bags; covers for rackets; racket grip tapes; strings for rackets; tennis racket dampeners, namely, vibration dampeners; tennis nets; hip and spine protectors for athletic use; racquetball gloves, in International Class 28 |

19.     The public relies on the HEAD Marks to indicate that the products offered in connection with those marks are of the same superior quality that consumers have come to expect from the brand.

## C. HEAD'S LICENSING PROGRAM

20.     Through its worldwide licensing program, Head provides an innovative and expansive product line to consumers (https://www.head.com/en_US/licensing#/ ).

21.    Head's licensing program encompasses many product categories including apparel, shoes, eyewear, bags, bicycles, fitness equipment, sports nutrition products including beverages, cosmetics, and accessories for various sports.

22.    In the United States alone, Head has granted licenses for the HEAD Marks for the following goods:

    a.    Golf wear, namely, shirts, slacks, shorts, rain gear, sweater, vests, golf gloves (www.headgolfapparel.com )

    b.    Golf clubs, bags, gloves, accessories, covers, tees and balls (https://www.head.com/en_US/licensing#accessories)

    c.    Ice skates, in-line skates, roller skates, wheels, bearings and protective gear for ice skates, in-line skates, roller skates, bags, scooters, kickboards and walking bikes, helmets for ice-, in-line-, roller skates, snow sledges

    d.    Kids bikes, mountain bikes, city bikes, beach cruisers, road bikes and e-bikes, bike accessories (https://www.headbikeusa.com/ )

    e.    Resistance training and accessories (https://www.headfitnessusa.com/ )

    f.    Table tennis paddles, table tennis sets, table tennis balls, table tennis tables, and table tennis accessories (https://www.eastpointsports.com )

    g.    Activewear including performance tennis apparel, including knit and woven tops and bottoms, tees, polo shirts, pants, shorts, track jackets, track suits, fleece, sweatshirts, sweatpants (https://www.highlifellc.com/portfolio/head/ )

    h.    Golf wear, namely, shirts, slacks, shorts, rain gear, sweater, vests, golf gloves (www.headgolfapparel.com )

    i.    Optical eyewear, sunglasses, and cases (www.wagner-kuehner.de )

      j.   Perfume (https://www.fragrantica.com/designers/Head.html )

23.     Head and its licensees invest substantial time and money to develop, manufacture, market, distribute, and sell goods under the HEAD Marks.  Their success has created a licensing program that represents an important and substantial source of revenue for both Head and its licensees.

24.     It is critical to the success of Head's licensing program and to the protection of Head's rights in the HEAD Marks that Head exercise control over the quality of goods offered by its licensees.

**D.  TRADEMARK LICENSE BETWEEN HEAD AND DEFENDANT UP TOWN SPORT**

25.     On December 20, 2018, Defendant Up Town Sport executed a trademark license agreement with Head.

26.     The trademark license agreement was supplemented with a Side Letter on July 6, 2020, and a second Side Letter on December 6, 2021 (collectively, the "License Agreement"). (Exhibit A).

27.     ██████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████

28.     ███████████████████████████████████████
██████████████████████████████████████████████████
███████████████████

29. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

30.     Paragraph 3 of the License Agreement defined the territory as: the United States, Canada, Bahamas, Dominican Republic, Jamaica, Panama, Trinidad and Tobago, and Puerto Rico.

31. ███████████████████████████████████████

█████████████████████████

32. ███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

33. █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████  ██████████████████████████

███████████████████████████████████  ███████████



34. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

35.     In License Agreement Exhibit B, Paragraph 6.5, Defendant Up Town Sport agreed that "any payments and statements due and/or payable after termination . . . of this Agreement in connection with sales of Licensed Products before termination . . . shall remain due and/or payable."

36. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

37.     In Paragraph 12 of the License Agreement, Defendant Up Town Sport agreed to "comply with the provisions of the e-commerce policy and brand guidelines."

38.     In Paragraph 14 of the License Agreement and Paragraph 3.11 of Exhibit B to the License Agreement, Defendant Up Town Sport agreed that "prior to appointing distributors or

representatives who distribute Licensed Products on Licensee's behalf . . . Licensee shall inform Licensor in writing of the names and addresses of such distributors or representatives.  Licensee needs to ensure that any distributors or representatives acknowledge the terms and conditions of this Agreement.  Licensee assumes primary liability for distributors/representatives' compliance with the terms of this Agreement."

39.     In License Agreement Exhibit B, Paragraph 8.3, Defendant Up Town Sport agreed to "co-operate and assist Licensor or Affiliate in protecting and enforcing Licensor's or Affiliate's rights to the Licensed Trademarks.  Licensee shall promptly inform Licensor of any infringement or imitation of the Licensed Trademarks that come to its attention."

40.     In License Agreement Exhibit B, Paragraph 8.4, Defendant Up Town Sport agreed "not to do anything either by act of omission or commission which might impair, jeopardize, violate or infringe the Licensed Trademarks or to misuse or bring into dispute the Licensed Trademarks."

41.     In License Agreement Exhibit B, Paragraph 8.5, Defendant Up Town Sport agreed not to "use the Licensed Trademarks as part of its company name, corporate name, trade name or email address."

42.     In License Agreement Exhibit B, Paragraph 8.6, Defendant Up Town Sport agreed, for the administrative and judicial defense of the Licensed Trademarks in the territory, to "furnish Licensor, Affiliate, or its designated legal representative with all proof and commercial, technical, or other information or assistance which Licensee is able to furnish and which Licensor, Affiliate or its lawyers may reasonably require for this purpose."

43.     In License Agreement Exhibit B, Paragraph 8.8, Defendant Up Town Sport agreed to "adhere to Licensor's policy entitled 'Code of Conduct' . . . ."

44.     In License Agreement Exhibit B, Paragraph 15(a)(ii), Defendant Up Town Sport agreed that upon expiration or termination of the License Agreement, Up Town Sport "shall immediately . . . cease the manufacture, distribution, advertising, promotion and sale of the Licensed Products."

45.     In License Agreement Exhibit B, Paragraph 15(c), Defendant Up Town Sport agreed that "within thirty (30) days [of termination] Licensee shall provide Licensor with a complete and accurate written statement . . . of its stock of finished Licensed Products, work in progress and material related to the product of Licensed Products as of the date of expiration or termination of this Agreement (hereinafter referred to as the "Undisposed Stock") as well as additional information as may be reasonably required by Licensor."

46.     ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████

**DEFENDANTS' WRONGFUL ACTS**

**A. Termination of License Agreement**

47.     On October 3, 2022, Head sent a Termination Warning Letter to Defendants. (Exhibit C).

48.     The Termination Warning Letter referenced Head's earlier warning letters regarding Defendants' failure to pay the guaranteed minimum royalties owed under the License Agreement for the 1st and 2nd quarters of 2022 and noted that Up Town Sport's required

guaranteed minimum royalty payment for the 3ʳᵈ quarter of 2023 was due for immediate

payment.

49.



50.

51.    Upon information and belief, in violation of License Agreement Exhibit B,

Paragraph 15.1(a)(i), Defendant Up Town Sport did not cease the manufacture, distribution,

advertising, promotion, and sale of the Licensed Products immediately upon the termination of the License Agreement.

52.    Upon information and belief, in violation of License Agreement Exhibit B, Paragraph 15.1(b), Defendant Up Town Sport did not pay all royalties due Head within thirty (30) days of the termination.

53.    In violation of License Agreement Exhibit B, Paragraph 15.1(c) of the License Agreement, Defendant Up Town Sport did not provide Head with a written inventory of Undisposed Stock.

54.    In violation of the License Agreement, Defendants listed themselves on the floor directory for their office at 1385 Broadway, Suite 910, New York, New York as "HEAD", as shown below:



55.    Defendants have never been part of Head and were never authorized to hold themselves out as Head.

**B.  Defendant Up Town Sport's Purchases from Shanghai Tanida Garments Co. Ltd.**

56.     Upon information and belief, during the License Term, Defendants entered into a business relationship with Shanghai Power Oriental International Trade Co. aka Shanghai Tanida Garments Co. Ltd. ("Shanghai Tanida") to supply Defendants with HEAD-branded golf wear.

57.     Upon information and belief, Defendants contracted with Shanghai Tanida to purchase 94,088 units of Licensed Products at a total cost of $380,144.40.

58.     Upon information and belief, Shanghai Tanida shipped and delivered all of the goods that Defendants ordered.

59.     Upon information and belief, Defendants failed to pay $300,144.40 to Shanghai Tanida for the delivered goods.

60.     On January 24, 2022, Shanghai Tanida filed suit against Defendant Up Town Sport in the U.S. District Court for the Southern District of New York, Case No. 1:22-cv-609 for failure to pay and breach of contract.

**C.  Defendant Up Town Sport's Purchase Orders with Hunter Rolling Fashion, Inc.**

61.     During the License Term, Defendant Up Town Sport entered into a business relationship with Hunter Rolling Fashion, Inc., a New York corporation with places of business at 108 W. 39th St., Ste. 1120 and 1385 Broadway, Ste. 1112, New York, NY 10018 to supply Defendants with HEAD-branded golf wear (the "Hunter Rolling Fashion Orders").

62.     ████████████████████████████████████████
████████████████████████████████

63.     Upon information and belief, Defendant Up Town Sport failed to pay Hunter Rolling Fashion all sums owed for the manufacture and storage of the purchased Licensed Products.

64.     Defendant Up Town Sport currently has no control over the Undisposed Stock in the custody of Hunter Rolling Fashion.

65.     On June 7, 2022, Defendant Up Town Sport executed a permission letter agreement with Hunter Rolling Fashion ("Permission Letter") (Exhibit D).  The Permission Letter states that "This is an agreement between Hunter Rolling Fashion Inc. and Up Town Sport Inc. in handling the goods and payment with the Head label."  The Permission Letter reflected Hunter Rolling Fashion's role as both a manufacturer/importer of goods for Defendant Up Town Sport and a storage and distribution facility for goods that Defendant Up Town Sport ordered from Hunter Rolling Fashion.

66.     The Permission Letter also provided that "[a]ny goods that exceed 45 days in Hunter rolling Fashion Inc.'s warehouse, Up Town Sport Inc. is to give Hunter Rolling Fashion Inc. the right to act as one of its sales agent [sic].  Hunter Rolling Fashion Inc. can also sell the balance of the goods.  All proceeds on the goods Hunter Rolling Fashion Inc. sold goes to Hunter Rolling Fashion Inc. to pay the manufacturing company in China, selling commission and warehousing fee."

67.     Defendants did not inform Head of the Permission Letter, in violation of Paragraph 14 of the License Agreement and License Agreement Exhibit B, Paragraph 3.11.

68.     Head contacted Hunter Rolling Fashion several times between December 2022 and February 2023 to notify them that they were not permitted to sell Undisposed Stock without Head's permission and directing them to contact Head's new licensee to explore the sale of Undisposed Stock in their custody or control.

69.    Since the License Agreement was terminated, Hunter Rolling Fashion sold a portion, but not all, of the Undisposed Stock in its possession at an unknown price to Head's current licensee.

70.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████





71.    The seller provided photographs of the goods offered for sale, shown below:

 



72.    Upon information and belief, the seller offering these goods was Hunter Rolling Fashion and the goods were part of the Undisposed Stock.

**D. Defendant's Purchase Orders with ING Trading Co., Ltd.**

73.    During the License Term, Defendant Up Town Sport entered into a business relationship with ING Trading Co., Ltd., Rm. 406, Danseong Bldg., 1-23, Yangjae 1-dong, Seocho-gu, 06739 Seoul, South Korea, to supply Defendants with HEAD-branded golf wear.

74.    ██████████████████████████████████████████████████████
████████████████████████████████████████████

75.    Upon information and belief, Defendant Up Town Sport failed to pay ING Trading all sums owned for the manufacture and storage of the purchased Licensed Products.

76.    Defendant Up Town Sport currently has no control over the Undisposed Stock ordered from ING Trading.

77.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████

24

███████████████████████████████████████████████

███████████████████████████████████

78.     On October 19, 2023, ING Trading provided Head with the details for the three freight forwarders holding the Licensed Products.

79.     ███████████████████████████████████

███████████████████████████████████

█ ███████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

█████████████████████

**E. Investigation of Undisposed Stock**

80.     Head engaged Polaris Corporate Risk Management LLC, a private investigation firm, to identify the location of the Undisposed Stock in anticipation of filing this suit.

81.     To locate the Undisposed Stock, Head's investigators tracked import/export records, but were unable to trace the goods' current location.

82.     Head's investigators also conducted site inspections at the following locations associated with the Defendants:  1385 Broadway, 1410 Broadway, 237 W. 37th St., and 108 W. 39th St. in Manhattan, and a warehouse at 4401 1st Avenue in Brooklyn.  Head's investigators did not locate Undisposed Stock at any of these locations.

83.     Head has not yet located the Undisposed Stock.

84.     Upon information and belief, Defendants are aware of Head's investigation and are keeping the Undisposed Stock hidden.

**F. Injury to Head and the Public**

85.     Defendants' unauthorized sale of Undisposed Stock or other products bearing Head's HEAD Marks is likely to cause confusion, mistake, and deception as to the source or origin of Defendants' products, and is likely to falsely suggest a sponsorship, connection, or association between Defendants, their products, and/or their commercial activities with Head.

86.     Defendants' actions described above are likely to dilute the distinctiveness and value of Head's HEAD Marks and to tarnish the brand's reputation.

87.     Defendants' unauthorized use of Head's HEAD Marks has damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure Head, Head's HEAD Marks, and the public's interest in being free from confusion.

88.     Defendants know that their use of Head's HEAD Marks is neither permitted nor authorized.  As a result, Defendants have acted knowingly, willfully, in reckless disregard of Head's rights, and in bad faith.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**Federal Trademark Counterfeiting**
**Under Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d)**

89.     Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

90.     Head owns each of the federally registered HEAD Marks.

91.     Defendants have used and/or continue to use counterfeits of Head's federally registered HEAD Marks in connection with the sale, offering for sale, and distribution of

clothing in violation of Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d).

### SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Trademark Infringement
### <u>Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)</u>

92.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

93.    Defendants used and/or continue to use in commerce reproductions, copies, and colorable imitations of Head's HEAD Marks in connection with the offering, distribution, and advertising of clothing, which is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

### THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Trademark Infringement, False Designation of Origin,
### Passing Off, and Unfair Competition
### <u>Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)</u>

94.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

95.    Defendants' use of Head's HEAD Marks, as described above, is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of Defendants, their products, and/or their commercial activities by or with Head, and thus constitutes trademark infringement, false designation of origin, passing off, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Trademark Dilution
### <u>Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)</u>

96.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

97.    Head's HEAD Marks are famous, as that term is used in 15 U.S.C. § 1125(c), and were famous prior to Defendants' first use of Head's HEAD Marks, based on, among other things, the federal registration of Head's HEAD Marks and the extensive nationwide use, advertising, promotion, and recognition of that mark.

98.    Defendants' actions, as described above, are likely to dilute the distinctive quality of Head's HEAD Marks via both blurring and tarnishment in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c), as amended by the Trademark Dilution Revision Act of 2006.

### FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### <u>Trademark Infringement Under New York Common Law</u>

99.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

100.    Defendants' acts and conduct complained of herein constitute trademark infringement in violation of New York common law.

101.    Head has no adequate remedy at law.  Head has suffered, and continues to suffer, irreparable harm such that Head is entitled to injunctive relief.

### SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### <u>Unfair Competition and Passing Off Under New York Common Law</u>

102.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

103.    Defendants' acts and conduct complained of herein constitute unfair competition and passing off in violation of New York common law.

104.    Head has no adequate remedy at law.  Head has suffered, and continues to suffer, irreparable harm such that Head is entitled to injunctive relief.


**SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**Dilution under New York General Business Law § 360-1**

105.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

106.    Defendants' acts and conduct complained of herein constitute dilution and injury to business reputation in violation of GBL § 360-1.

107.    Head has no adequate remedy at law.  Head has suffered, and continues to suffer, irreparable harm such that Head is entitled to injunctive relief.


**EIGHTH CAUSE OF ACTION AGAINST DEFENDANT UP TOWN SPORT**
**Breach of Contract Under New York Common Law**

108.    Head hereby repeats and realleges each and every allegation set forth in each of the preceding paragraphs of this Complaint.

109.    The License Agreement between Head and Defendant Up Town Sport is a valid and enforceable contract.

110.    Head has satisfied all of its obligations under the License Agreement.

111.    Defendant Up Town Sport breached the License Agreement by failing to pay all royalties due Head, in violation of Paragraphs 5 and 6 of the License Agreement, and Exhibit B, Paragraphs 5 and 6 of the License Agreement.

112.    Defendant Up Town Sport breached the License Agreement by failing to cease the manufacture, distribution, advertising, promotion, and/or sale of Undisposed Stock after termination of the License Agreement, in violation of Exhibit B, Paragraph 15(a)(ii) of the License Agreement.

113.    Defendant Up Town Sport breached the License Agreement by failing to provide Head with "a complete and accurate written statement . . . of its stock of finished Licensed Products, work in progress and material related to the production of Licensed Products as of the date of expiration or termination" of the License Agreement, in violation of Exhibit B, Paragraph 15(c) of the License Agreement.

114.    Defendant Up Town Sport breached the License Agreement by failing to provide Head with the location of Undisposed Stock after the termination of the License Agreement, in violation of Exhibit B, Paragraph 15(c) of the License Agreement.

115.    Defendant Up Town Sport breached the License Agreement by failing to complete the purchase of Undisposed Stock from its suppliers ING Trading and Hunter Rolling Fashion, falling into debt with those suppliers and thus losing custody and control of the Undisposed Stock.

116.    Defendant Up Town Sport breached the License Agreement by selling Undisposed Stock on Amazon.

117.    Defendant Up Town Sport breached the License Agreement by entering into the Permission Letter with Defendant Hunter Rolling Fashion Inc., in violation of Paragraph 14 of the License Agreement, which required Head's prior notice and approval.

118.    Defendant Up Town Sport breached the License Agreement by allowing Defendant Hunter Rolling Fashion Inc. to distribute and sell Undisposed Stock after the termination of the License Agreement.

119.    The actions of Defendant Up Town Sport described above have at all times relevant to this action been willful.

120.    As a direct and proximate result of Defendant Up Town Sport's actions, Head has been irreparably injured, will continue to be injured, and has suffered monetary damages in an as-yet undetermined amount.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Head respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Head prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1.    An order declaring that Defendants, their affiliates, officers, agents, servants, employees, attorneys, owners, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

   a.    Using the HEAD Marks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Head product or is not authorized by Head to be sold in connection with the HEAD Marks;

   b.    Passing off, inducing, or enabling others to sell or pass off any product as a genuine Head product or any other product produced by Head that is not Head's

or not produced under the authorization, control, or supervision of Head and approved by Head for sale under the HEAD Marks;

c.  Shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manners, products or inventory not manufactured by or for Head, nor authorized by Head to be sold or offered for sale, and which bear any HEAD Marks, or any reproductions, counterfeit copies, or colorable imitations thereof;

d.  Operating stores, offices, distribution centers, warehouses, or other facilities that are involved with the distribution, warehousing, marketing, advertising, offering for sale, or sale of any product bearing the HEAD Marks or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine HEAD product or not authorized by Head to be sold in connection with the HEAD Marks;

e.  Committing any acts calculated to cause consumers to believe that Defendants' counterfeit products are those sold under the authorization, control, or supervision of Head, or are sponsored by, approved by, or otherwise connected with Head;

f.  Further infringing or diluting the HEAD Marks and damaging Head's goodwill; and

g.  Otherwise competing unfairly with Head in any manner.

2.  An Order directing Defendants to, within thirty (30) days after the entry of the injunction, file with this Court and serve on Head's attorneys a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

3.   An order for an award of Defendants' profits and Head's damages under 15 U.S.C. § 1117(a), enhanced and treble damages including for willfully and intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark in violation of 15 U.S.C. § 1114(1)(a);

4.   In the alternative to an award of Defendants' profits and Head's actual damages, an order for a reward of enhanced discretionary damages and treble damages for willful use of a counterfeit mark in connection with the sale, offering for sale or distribution of goods, for statutory damages under 15 U.S.C. § 1117(c) in the amount of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale or distributed, as the Court considers just, which Head may elect prior to rendering final judgment;

5.   An order for an award of Defendants' profits and Head's damages pursuant to 15 U.S.C. § 1117(a) in an amount to be proven at trial and such other compensatory damages as the Court determines to be fair and appropriate for false designation of origin and unfair competition under 15 U.S.C. § 1125(a);

6.   An order for an award of damages to be proven at trial for common law unfair competition and breach of contract;

7.   An order requiring Defendants to pay all royalties and other monies owed to Head;

8.   An order that an asset freeze or constructive trust be imposed over any and all monies, profits, gains, and advantages in Defendants' possession that rightfully belong to Head;

9.   An order for an award of exemplary or punitive damages in an amount to be determined by the Court;

10. An order for an award of Head's attorney's fees and costs; and

11. An order for such other and further relief as the Court may deem just and equitable.

Dated:  November 20, 2023

Respectfully submitted,

_____

William P. Deni, Jr.
J. Brugh Lower
**GIBBONS P.C.**
One Pennsylvania Plaza
Floor 45, Suite 4515
New York, New York 10119
(212) 613-2000
wdeni@gibbonslaw.com
jlower@gibbonslaw.com

Danny M. Awdeh (*pro hac vice* to be filed)
Lisa Peller London (*pro hac vice* to be filed)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

*Attorneys for Plaintiff*
*Head Sport GmbH*

EXHIBIT A

REDACTED

EXHIBIT B

REDACTED

EXHIBIT C

REDACTED

EXHIBIT D

# HUNTER ROLLING FASHION INC.

*1385 BROADWAY, SUITE #1012, NEW YORK NY 10018*

This is an agreement between Hunter Rolling Fashion Inc. and Up Town Sport Inc. in handling the goods and payment with the Head label.

Hunter Rolling Fashion Inc. agrees to give Up Town Sport Inc. a total of $150,000 credit line. The term of the credit is 15 days. If the amount of goods exceeds $150,000 credit line, the excess must be paid in full for Hunter Rolling Fashion Inc. to release the additional goods.

The handling/payment procedure is as followed:

Each time a container is shipped from China, Hunter Rolling Fashion Inc. is to give Up Town Sport Inc. the packing list. Hunter Rolling Fashion Inc. will inform Up Town Sport Inc. once the container is received in Hunter Rolling's warehouse and at the same time an invoice is issued for the container. Up Town Sport Inc. can take in the container in multiple shipments but must be whole units by style. Up Town Sport Inc. is liable for the storage fee on goods that exceed 30 days in the warehouse. Up Town Sport Inc. has 45 days to complete the container.

Any goods that exceed 45 days in Hunter Rolling Fashion Inc's warehouse, Up Town Sport Inc. is to give Hunter Rolling Inc. the right to act as one of it's sales agent. Hunter Rolling Fashion Inc, can also sell the balance of the goods. All proceeds on the goods Hunter Rolling Fashion Inc. sold goes to Hunter Rolling Fashion Inc. to pay to the manufacturing company in China, selling commission and warehousing fee.

6-7-2022

Hunter Rolling Fashion Inc.

Up Town Sport Inc.

6/7/2022.